**E-FILED**
Thursday, 30 November, 2006  12:14:20 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| JANET M. RIDINGS, | ) |
| Plaintiff, | ) |
| v. | ) No. 05-2134 |
| RIVERSIDE MEDICAL CENTER, | ) |
| Defendant. | ) |

**OPINION**

On June 3, 2005, Plaintiff Janet Ridings filed a Complaint (#1) against Defendants Riverside Medical Center, Jeff Pollock, and Kyle Hansen alleging violations of the Family and Medical Leave Act (FMLA) and the Fair Labor Standards Act (FLSA), a state law claim for intentional infliction of emotional distress, and retaliatory discharge.[1]  This matter is now before the court on cross motions for summary judgment.  For the reasons that follow, Plaintiff's Motion for Summary Judgment (#33) is DENIED and Defendant's Motion for Summary Judgment (#35) is GRANTED.

FACTS

Defendant Riverside Medical Center (Riverside) is a not-for-profit corporation operating a hospital in Kankakee, Illinois.  Plaintiff Ridings began her employment with Riverside in 1998 as

---

[1] On October 10, 2006, the intentional infliction of emotional distress count was dismissed by this court on motion of Plaintiff.  Because this was the only count against Defendants Pollock and Hansen, they have been terminated as Defendants in this action.

a Knowledge Manager/Systems Analyst. Ridings' job title was later changed to Knowledge Manager, although her job duties remained essentially unchanged. In this position, Ridings was responsible for responding to requests from Riverside employees to extract data from Riverside's computer network records and convert it into relevant, useful information through query reports. Ridings spent most of her work day at her computer. Employees making requests to Ridings communicated these requests through email, phone, and personal visits. During the time period relevant to this lawsuit, Jeff Pollock held the position of Vice President of Information Technology and Chief Information Officer with Riverside. Ridings reported to Pollock when she began her employment at Riverside. On April 12, 2002, Ridings began reporting to Kyle Hansen, who served as Systems Applications Manager. Ridings alleges that after Hansen became her supervisor, he and Pollock began a campaign to humiliate her because she is a woman.[2] According to Ridings, Hansen and Pollock intended to force her to quit or, in the alternative, sought to justify her termination.

Throughout her employment, Ridings was classified as a salaried exempt employee pursuant to the provisions of the FLSA. Riverside defines a regular full-time employee as one who is "regularly scheduled to work 30 hours per week or more." The policy and procedure for exempt employees states:

> Exempt staff are paid a salary for the job for which they were hired. The actual hours an exempt staff member works to complete the job for which they were hired are not recorded. If the work load for an exempt staff member goes above 40 hours in a week, that person does not receive additional compensation. If the work load for an exempt staff member requires only 30 hours to complete, the exempt staff

---

[2] Ridings has not alleged a sex discrimination claim in this case.

person still gets paid their full salary.

Exempt employees "swipe in" when they arrive at work, but do not "swipe out" when they leave.

On December 14, 2002, Ridings was diagnosed with Graves' disease. On January 14, 2003, Ridings had surgery to remove her thyroid. Prior to the surgery, Riverside directed Ridings to complete FMLA medical certification forms and to have her leave certified by her physician. Ridings' physician, Dr. Moss, filled out the medical certification and Ridings returned the certificate to Riverside. Ridings' physician stated in the application that Ridings would be able to perform the essential functions of her job after recovery from surgery. Riverside designated Ridings' absence from work for her surgery as FMLA leave. Ridings returned from FMLA leave in February 2003. Ridings asserts that she suffered from "mental fatigue" from January 2003 through the end of 2003. Ridings further asserts this "mental fatigue" is a symptom of Graves' disease. Ridings did not work eight hours per day everyday on Riverside's premises for the rest of 2003 because, according to Ridings, her "mental fatigue" prevented her from working an eight hour day on Riverside's premises. Ridings testified that Hansen asked her occasionally for an update on why she was not working eight hours per day. Ridings informed him that she became tired in the late afternoon and was taking work home with her. Pollock understood that Ridings' reduced schedule was due to her surgery and medication and that Ridings was unable to work 8 hours per day at the hospital.

Riverside maintained during this time period a "Work Schedules" policy which provided that work schedules may vary based upon staffing needs and operational demands. The policy further provided that supervisors would advise employees of their individual work schedule. Riverside also maintained an "Attendance and Punctuality" policy which stated "excessive absenteeism that is not considered a serious health condition under the [FMLA] will lead to disciplinary action, up

to and including termination." Riverside further maintained Employee Conduct and Work Rules that precluded insubordination, excessive absenteeism, and unauthorized absences from an employee's workstation. However, under the section "Essential Functions" in the job description for Knowledge Manager, there is no reference to the number of hours to be worked per day or week.

On January 25, 2004, Hansen met with Ridings and told her she needed to be on the premises for a full eight hours per day. Ridings did not begin working eight hours per day on the premises as a result of this meeting. On February 25, 2004, Hansen again met with Ridings to discuss working eight hours per day on premises. Ridings continued to fail to work eight hours per day on premises after this meeting. Ridings asserts she attempted to work at the hospital until 5:00 p.m., but she almost fell asleep driving home on two occasions. Ridings asserts that, as a result, she did not work at the hospital after 4:00 p.m. or 4:30 p.m. unless she had a ride home. Ridings testified that she took work home and did it during the evenings and weekends to perform the tasks expected of her.     On March 22, 2004, Hansen gave Ridings a Corrective Action Report and asked her to read and sign it. The report was given to Ridings because she was not working eight hours per day and was "arriving at work between 8 a[.m.] and 8:30 a[.m.], and leaving for the day between 2:30 p[.m.] and 3:00 p[.m.]." The report further indicated that "[w]orking a full 8 hour day must begin immediately." After receiving the Corrective Action Report, Ridings still did not work eight hours per day on the premises. On March 31 or April 1, 2004, Ridings provided Hansen with documentation from her physician indicating that she could not work eight hours per day until further notice due to her medical condition. Hansen met with Ridings and informed her that, based on her doctor's note, she needed to provide FMLA paperwork. Hansen gave Ridings the form to request "intermittent leave" under the FMLA and the FMLA medical certification forms. This form

states, "Form must be returned within 15 days or leave request may be delayed." By April 16, 2004, Ridings had failed to return the medical certification form. Ridings received another Corrective Action Report from Hansen on April 20 or 21, 2004, which was based on Ridings' failure to submit her FMLA paperwork within the requested 15 day period. This Corrective Action Report stated that "FMLA paperwork requesting intermittent leave needs to be completed by her physician and presented back to her supervisor by April 28, 2004." If that did not occur Ridings was to be placed on suspension for three days without pay. If she did not present the paperwork upon her return from suspension, she "could be terminated." After receiving this Corrective Action Report, Ridings again did not complete the FMLA certification and continued to not work eight hours per day on premises.

On May 10, 2004, Ridings was suspended for three days. She was provided with a Corrective Action Report stating that she was suspended for failing to return the FMLA paperwork by April 28, 2004. This suspension was without pay.[3] The report again indicated "FMLA paperwork requesting intermittent leave needs to be completed by her physician and presented back to her supervisor by May 13, 2004." When Ridings returned to work on May 13, 2004, she did not submit the FMLA medical certification and was terminated.

On July 20, 2003, Ridings filed a workers' compensation claim, alleging that she developed Graves disease as a result of stress at work. In January 2004, Pollock and Hansen[4] decided to discontinue a prepaid plan for vendor support for a computer software system used by Ridings, Crystal Reports. The support system was still available to Ridings, but Riverside now only paid for

---

[3] On February 24, 2005, Riverside sent Ridings a check in the amount of $555.93 for payment of wages from her three day suspension. Ridings' attorney returned the check to counsel for Riverside.

[4] The parties dispute whether Hansen was involved in this decision.

time and materials actually used. Ridings asserts that this decision was a result of her workers' compensation claim. Ridings asserts that this decision occurred right after she completed a payroll conversion project and, as a result, she was no longer in a vital position. Ridings further asserts that in April of 2004, Hansen made a comment ridiculing Ridings' workers' compensation claim. This comment was made when a coworker climbed on a table to change the time on a clock. Hansen allegedly stated, "Watch out, we don't want a workers' comp. claim."

## ANALYSIS

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, the court must decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In reaching this decision, the court must consider the evidence in the light most favorable to the party opposing summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The burden of establishing that no genuine issue of material fact exists rests with the movant. Jakubiec v. Cities Serv. Co., 844 F.2d 470, 473 (7th Cir. 1988).

### I.  FMLA Interference Claim

Under the Family and Medical Leave Act (FMLA), eligible employees of a covered employer are provided the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period for a serious health condition as defined by the Act. 29 U.S.C. § 2612(a)(1). After the period of qualified leave expires, the employee is entitled to be reinstated to the former

position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave. 29 U.S.C. § 2614(a). The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a)(1). When an employee alleges a deprivation of these substantive guarantees, the employee must demonstrate by a preponderance of the evidence only entitlement to the disputed leave. King v. Preferred Tech. Group, 166 F.3d 887, 891 (7th Cir. 1999). Plaintiffs may also bring claims under the FMLA if they are discriminated against for exercising their rights under the statute. 29 U.S.C. § 2615(a)(1) & (2). "A claim under the FMLA for wrongful termination can be brought under either a discrimination/retaliation or interference/entitlement theory; the difference is that the first type of claim requires proof of discriminatory or retaliatory intent while the latter requires only proof that the employer denied the employee his or her entitlements under the Act." Kauffman v. Fed. Express Corp., 426 F.3d 880, 884 (7th Cir. 2005).

Ridings first asserts a claim under an interference/entitlement theory. An employee alleging that her employer interfered with her substantive rights under the FMLA must demonstrate that she is entitled to leave by a preponderance of the evidence.[5] Furthermore, to succeed on an FMLA interference claim, an employee need not demonstrate discriminatory or retaliatory intent. Rather, the employee must simply demonstrate that the employer denied her the entitlements of the FMLA. Kauffman, 426 F.3d at 884. To take leave under the FMLA, an employee must first notify her employer of the need for FMLA leave. Price v. City of Fort Wayne, 117 F.3d 1022, 1026 (7th Cir.

---

[5] In the instant case, there is no issue Ridings suffered from a serious health condition qualifying her for FMLA leave as Riverside concedes in its reply to its motion for summary judgment.

1997).[6]  It is then the employer's responsibility to determine the applicability of the FMLA.  Price, 117 F.3d at 1026.  An employer may require that an employee obtain, in a timely manner, a written certification by a health care provider regarding the medical condition necessitating leave.  29 U.S.C. § 2613(a); 29 C.F.R. § 825.305(a).  A request for medical certification must be in writing unless the employee has, within the preceding six months, been given the required written notice regarding the FMLA and the employer's specific FMLA policies.  29 C.F.R. § 825.301(c)(2)(ii).  If an employer requires the employee to submit this certification, it must give the employee at least fifteen calendar days within which to do so and must notify the employee of the consequences of a failure to comply with this requirement.  29 C.F.R. § 825.301(b)(1); 29 C.F.R. § 825.305(b) & (d).  If the employer requires certification and the employee fails to provide sufficient certification, then the absence is not FMLA leave.  29 C.F.R. § 825.311(b).[7]

Ridings was terminated after she failed to submit a medical certification requested by Riverside.  There is no issue that Ridings did not submit the requested medical certification.  Rather, Ridings asserts that she was not required to do so because Riverside failed to follow the regulations governing how this certification is to be acquired.  Specifically, Ridings argues that the notification she received was inadequate because she was not informed 15 days before her termination or suspension that she could receive this specific discipline if she failed to submit the requested

---

[6] There is no dispute that Ridings provided this notice. Ridings provided Hansen with documentation from her physician indicating that she could not work eight hours per day until further notice due to her medical condition on March 31 or April 1, 2004.

[7] Ridings argues she was not required to submit a certification in this matter because she was on some form of de facto FMLA leave beginning February 3, 2003. However, even if this were true, Riverside was entitled to request a subsequent certification pursuant to 29 C.F.R. § 825.308.

certification.

This court concludes under the unique circumstances of this case that Riverside complied with the FMLA in notifying Ridings of her need to provide a medical certification to justify her reduced schedule leave. Hansen provided Ridings with a medical certification form on March 31 or April 1, 2004, which indicated Ridings needed to complete the certification within 15 days or the leave request could be delayed. More than 15 days passed after Ridings received this form before Ridings was suspended on May 10, 2004, and terminated on May 13, 2004.[8] Hansen had given Ridings a Corrective Action Report on March 22, 2004, because she was not working eight hours per day and was "arriving at work between 8 a[.m.] and 8:30 a[.m.], and leaving for the day between 2:30 p[.m.] and 3:00 p[.m.]." The report further indicated that "[w]orking a full 8 hour day must begin immediately." Riverside maintained an "Attendance and Punctuality" policy which stated "excessive absenteeism that is not considered a serious health condition under the [FMLA] will lead to disciplinary action, up to and including termination." Thus, Ridings was aware if her absences were not considered leave, she could be terminated. Furthermore, Riverside provided Ridings with additional written notification in the form of Corrective Action Reports on April 21, 2004, and May 10, 2004, that she would be subject to suspension and termination if she did not submit the certification, and Ridings failed to comply. Thus, this court concludes Ridings was provided sufficient written notice of the consequences of failing to provide certification on March 31 or April 1, 2004, when she was given the medical certification form, particularly in light of the subsequent

---

[8] It is apparent from the record that Ridings did not intend to submit the certification. Ridings specifically testified in her deposition that she "did not have a serious health condition that made [her] unable to perform the essential functions of [her] job" and believed Riverside was "using this as an attempt to violate the FLSA and Workers' Compensation Act."

corrective action reports received by Ridings. See Poteet v. Potter, 2005 WL 1115805 at *19 (S. D. Ind. 2005) (employee received sufficient written notification of consequences for failure to provide certification where letter given to employee indicated failure to submit certification could result in absences being considered unauthorized and employee was terminated for these unauthorized absences).[9]

## II. Retaliation Claims

Ridings also asserts her termination was in retaliation for her assertion of rights under the Illinois Workers' Compensation Act, the FMLA, and the FLSA. On each of these claims, Ridings can prove a claim of retaliation through either the direct or indirect method of proof. Haywood v. Lucent Tech., Inc., 323 F.3d 524, 531 (7th Cir. 2003). Ridings asserts direct evidence of retaliation only with regard to her retaliation claim under the workers' compensation statute. Ridings first argues that the temporal proximity of the filing of her workers' compensation claim to her termination is circumstantial evidence to sustain her claim. However, her workers' compensation claim was filed in July 2003 and she was not terminated until May 2004. This gap of almost one year is insufficient to provide direct evidence of discrimination. See Haywood, 323 F.3d at 532 (one year gap between time plaintiff informed employer of her internal discrimination complaint and her termination did not support inference of causation); Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499 (7th Cir. 1998) (no causal inference where employee terminated five months after filing EEOC

---

[9] Ridings also argues that she could not have been terminated for failure to file the certification because Hansen had characterized her request for leave as intermittent rather than reduced schedule. The court finds this argument without merit. Ridings cites no authority for the proposition that essentially referring to the leave sought by the employee by the wrong name negates the requirement for certification. Furthermore, there is nothing in the record to indicate that Riverside intended for Ridings to take any leave other than reduced schedule leave.

complaint).[10]  Ridings further asserts that because Hansen sent an email to two members of Riverside's Risk Services Department detailing the proposed disciplinary action with regard to her failure to file her FMLA certification, there is circumstantial evidence of discrimination.  Ridings bases this assertion on the fact that these two people were in charge of handling Ridings' workers' compensation claim.  However, there is no evidence that this email contained any reference to Ridings' workers' compensation claim.  Finally, Ridings asserts that Hansen once remarked to a coworker who climbed on a table to change the time on a clock, "Watch out, we don't want a workers' comp. claim."  "When a plaintiff offers an employer's stray remark in a discrimination case, it is necessary to demonstrate 'some nexus' between the remark and the challenged employment decision."  Scaife v. Cook County, 446 F.3d 735, 741 (7th Cir. 2006), quoting Cowan v. Glenbrook Sec. Servs., Inc., 123 F.3d 438, 444 (7th Cir. 1997).  While Hansen was a decision maker with regard to Ridings' termination, this remark is simply too attenuated to constitute evidence of discrimination as it makes no reference to Ridings or the complained of action.

Ridings seeks to proceed under the indirect method of proof as to all three claims.  The indirect method utilizes the burden-shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as adapted for use in retaliation claims.  Marchman v. Advocate Bethany Hosp., 2006 WL 1987815 at *7 (N. D. Ill. 2006).  Under this framework, Ridings must establish that: (1) she was engaged in statutorily protected activity; (2) she was performing her job according to Riverside's legitimate expectations; (3) she suffered a materially adverse action by Riverside; and (4) she was treated worse than a similarly situated employee who did not engage in statutorily

---

[10] Ridings asserts that her attorney sent a settlement offer to Riverside's attorney on March 8, 2004.  However, there is no indication any decision maker with regard to Ridings' termination was aware of this offer.

protected activity. Marchman, 2006 WL 1987815 at *8. If Ridings is able to establish a prima facie case, the burden shifts to Riverside to provide a legitimate, nondiscriminatory reason for the adverse employment action. Marchman, 2006 WL 1987815 at *8. If Riverside provides a legitimate reason, the burden shifts back to Ridings to show that Ridings' proffered reasons are pretextual. Marchman, 2006 WL 1987815 at *8.

Ridings' retaliation claims must fail under the indirect method because she is unable to establish a prima facie case. Initially, Ridings has failed to demonstrate that she was engaged in statutorily protected activity with regard to her FLSA or FMLA claims. It is uncontested Ridings did not raise an issue with Riverside pursuant to the FLSA prior to her termination. With regard to her FMLA claim, Riverside did not believe she was required to take FMLA leave and thus refused to submit the medical certification to enable her to take leave. Ridings testified during her deposition she "did not have a serious health condition that made [her] unable to perform the essential functions of [her] job" and believed Riverside was "using this as an attempt to violate the FLSA and Workers' Compensation Act." Because Ridings did not assert her entitlement to leave under the FMLA, she cannot assert a retaliation claim. See Burnett v. LFW, Inc., 2005 WL 3312573 at *3 (N. D. Ill. 2005).

On all three retaliation claims, Ridings has also failed to identify similarly situated employees who did not engage in statutorily protected activity who were treated differently. There is no dispute that Ridings was not working 8 hours per day on the premises at Riverside or that Riverside asked Ridings to fill out FMLA certification forms to continue working this schedule. There is also no dispute that Ridings did not submit this certification. Ridings points to two employees, Dee Anna Hillebrand and Kurt Ciabattarri, who worked from home during the years

2003 and 2004. However, these employees did not work at home for portions of every day. Rather, the evidence indicates that Hildebrand worked from home one day per week and Ciabatarri worked from home less than one day every two weeks. Furthermore, neither of these employees cited a health reason requiring to work from home. As a result, Riverside did not ask them to complete FMLA certification forms. Ridings was terminated for failing to complete the requested forms. Without presenting information on this critical factor, Ridings cannot establish her prima facie case. See Hull v. Stoughton Trailers, 445 F.3d 949, 952-53 (7th Cir. 2006).

Furthermore, even if Ridings were able to establish a prima facie case, Ridings has not demonstrated that Riverside's proffered reason for her termination is pretextual. Riverside has stated a legitimate, nondiscriminatory reason for the termination, Ridings' refusal to submit FMLA certification justifying her inability to work 8 hours per day on Riverside's premises. As concerns her FMLA retaliation claim, Ridings asserts this reason is pretextual because she was already on FMLA leave and Hansen termed the leave "intermittent" rather than "reduced schedule." However, while Riverside has conceded that in light of discovery it has determined Ridings qualified for FMLA leave, during the time certification was requested Riverside had not designated Ridings' for FMLA leave. With regard to Ridings' argument regarding intermittent versus reduced schedule leave, there is no indication in the record that this was anything other than a mistake by Hansen. Ridings never pointed out that she wanted reduced schedule over intermittent leave. As concerns her FLSA retaliation claim, Ridings makes no argument of pretext other than stating it "occurred together" with the FMLA violation. Finally, with regard to her workers' compensation retaliation claim, Ridings points to no other evidence than the circumstantial evidence discussed above which this court has already determined is insufficient to sustain her claim. Because Ridings is unable to

make a viable argument that Riverside's nondiscriminatory reason was pretextual, summary judgment is appropriate on her retaliation claims.

### III. FLSA Claim

Finally, Ridings brings a claim pursuant to the FLSA based upon her three day suspension without pay. The FLSA sets the federal standards for overtime compensation. These overtime requirements do not apply to employees serving in a "bona fide executive, administrative or professional capacity." 29 U.S.C. § 213(a)(1). Rather, an employee is considered paid on a "salary basis" for purposes of the FLSA where, on a weekly or less frequent basis, she receives a predetermined amount of pay which is not subject to reduction regardless of the quality or quantity of work. 29 C.F.R. § 541.602(a). "'If an employer docks an employee's pay for partial day absences, violations of rules other than those of safety, or based on the quantity or quality of the employee's work, the employee is not considered to be on a salary basis.'" Kennedy v. Commonwealth Edison Co., 410 F.3d 365, 370 (7th Cir. 2005), quoting Piscione v. Ernst & Young, 171 F.3d 527, 534 (7th Cir. 1999). Thus, the consequence to an employer for failing to abide by the FLSA with regard to docking the pay of salaried employees is the loss of the exemption. See 29 C.F.R. § 541.603(a).

In the instant case, Ridings makes no argument that as a result of her three day suspension she should be considered an hourly employee and receive lost overtime compensation. Rather, Ridings seeks merely to recover the pay from the three days she was suspended.[11] Ridings has cited

---

[11] The court notes that Riverside offered to pay Ridings for the three days she was suspended. This may entitle Riverside to utilize the "window of correction" and maintain Ridings' exempt status. See 29 C.F.R. § 541.603©; Kennedy, 410 F.3d at 372. However, this court need not address this argument because Ridings is not arguing that she should be compensated for lost overtime wages.

no decision which allows an employee to recover for one instance of being placed on suspension for the lost days worked, nor has Ridings indicated any statutory basis for such a recovery. Accordingly, this court finds no basis for relief on Ridings' FLSA claim.

IT IS THEREFORE ORDERED:

(1) Plaintiff's Motion for Summary Judgment (#33) is DENIED.

(2) Defendant's Motion for Summary Judgment (#35) is GRANTED.

(3) Defendant's Motion to Supplement Motion for Summary Judgment (#47) is DENIED.

(4) This case is terminated.

ENTERED this 30th day of November, 2006

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE